IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

TEAMSTERS JOINT COUNCIL NO. 83 )
OF VIRGINIA PENSION FUND, *et al.*, )
)
*Plaintiffs*, )
)
v. ) Civil No. 3:08CV340–HEH
)
EMPIRE BEEF CO., INC. and )
WEIDNER REALTY ASSOCS., )
)
*Defendants*. )

## MEMORANDUM OPINION

This is a civil action under the Employment Retirement Income Security Act of 1974 ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1001, *et seq*. It is presently before the Court on remand from the Fourth Circuit for a decision on the merits of Plaintiffs' claim under 29 U.S.C. § 1392(c). For the reasons stated below, this Court holds that evading or avoiding withdrawal liability was not a principal purpose of Defendants' Composition Agreement. Accordingly, Plaintiffs must honor the Agreement when assessing and collecting Defendant Empire Beef's withdrawal liability.

### I. BACKGROUND

In the 1930's, Steven Levine's grandfather formed Defendant Weidner Realty Associates ("Weidner") to purchase a parcel of land in Rochester, New York. Shortly after purchase, the parcel was converted into a slaughterhouse. Empire Beef Co., Inc. ("Empire") was formed to operate the slaughterhouse. Empire assumed all

responsibilities of property ownership, but Weidner remained the record owner of the property. Weidner ceased all other operations.

In 1993, Empire sought financing in the amount of $1.8 million for improvements to the property. As a condition to the financing, the County of Monroe Industrial Development Agency ("COMIDA") became the record owner of the parcel. COMIDA leased the property to Weidner, which subleased the property rent free to Empire. At the time, Weidner's partners were Empire; Empire's sole shareholder, Steven Levine; and Steven's father, Sidney Levine.

In 2002, Empire's largest customer terminated its contract. This prompted Empire to expand into new product markets, which required Empire to drastically improve its facilities. Empire financed the changes with a $9 million balloon promissory note with General Electric Commercial Finance Business Property Corporation ("GE Commercial") and an additional $919,256.09 from General Electric Capital Corporation ("GE Capital").

Empire also sought to expand its distribution territory into the southern United States. Empire initially employed non-union drivers to cover the new distribution territory, but ultimately hired union drivers at the insistence of the Virginia Teamsters Union. Empire thus became party to a collective bargaining agreement which obligated it to contribute to the Teamsters Joint Council No. 83 of Virginia Pension Fund ("Pension Fund" or "Virginia Teamsters").

To accommodate the change to union drivers, Empire established a terminal in Richmond, Virginia. Originally, Empire planned to have its non-union drivers deliver

goods to the Richmond depot, where union drivers would pick up Empire's products for distribution to the southern states. Ultimately, the plan proved unworkable. Empire closed the terminal on September 30, 2005.

On December 14, 2005, the Pension Fund notified Empire that its cessation of operations in Richmond had triggered withdrawal liability in the amount of $504,000.00.[1] In order for Empire to satisfy its withdrawal obligations, the Pension Fund set up a payment plan which required Empire to pay monthly installments of $7,464.00 to the Fund. Empire made its first payment on February 3, 2006, and continued paying its monthly obligation for 20 months.

By early 2007, Empire was in dire financial straits. Steven Levine infused Empire with $500,000 of his own funds, and Sidney Levine loaned it an additional $1.3 million. On September 6, 2007, Empire filed a voluntary petition for bankruptcy under Chapter 11 in the United States Bankruptcy Court for the Western District of New York. Empire has not made any payments to the Pension Fund since that date.

On January 5, 2008 with the bankruptcy suit still pending, Steven Levine entered into an agreement (the "Composition Agreement") with his father, Sidney Levine. Pursuant to the Composition Agreement, Empire transferred its 50 percent interest in Weidner to Sidney Levine in exchange for cancellation of Sidney's $1.3 million loan. Five days later, the bankruptcy court dismissed Empire's bankruptcy proceeding without discharging Empire's debts.

---

[1] The MPPAA provides that an employer who withdraws from an ongoing multi-employer pension plan is liable for a proportionate share of the plan's unfunded vested liability. This is commonly referred to as "withdrawal liability." See 29 U.S.C. § 1381.

3

On February 5, 2008, the Pension Fund notified Weidner that it was jointly and severally liable for Empire's withdrawal liability because, the Pension Fund claimed, Weidner was a member of Empire's "control group." On June 3, 2008, the Pension Fund sued Empire and Weidner to recover Empire's unpaid withdrawal liability, plus interest, in the amount of $485,936.18. Empire did not dispute its responsibility for withdrawal liability, and this Court entered summary judgment against Empire on April 27, 2009. Weidner, however, contested Plaintiffs' claims of joint and several liability on the grounds that it was neither a "trade or business" as defined by ERISA, nor was it part of Empire's "control group."

During discovery, the Pension Fund learned about the Composition Agreement. The Pension Fund filed a motion *in limine* asserting that the Composition Agreement constituted an attempt to evade or avoid withdrawal liability under 29 U.S.C. § 1392(c), and thus it could be disregarded in the assessment and collection of withdrawal liability. The case proceeded to a bench trial on May 18, 2009.

At trial, both parties briefly questioned Steven Levine about his motive for entering into the Composition Agreement. Steven testified that the purpose of the transaction was to protect his father from Empire's unsecured creditors, and acknowledged that the Pension Fund was one such unsecured creditor. He denied, however, that Empire's withdrawal liability to the Pension Fund was the impetus for the Agreement. Based on Steven's testimony, Plaintiffs argued that the Composition Agreement should be void as to the Pension Fund.

On June 18, 2009, this Court held that Empire and Weidner were not under common control, and thus Weidner was not jointly and severally liable for Empire's withdrawal liability. However, this Court declined to reach the merits of Plaintiffs' Section 1392(c) claim on the belief that the Fourth Circuit's holding in *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115 (4th Cir. 1991), precluded this Court from considering post-withdrawal transactions.

On May 27, 2010, the Fourth Circuit issued a *per curiam* opinion affirming this Court's holding concerning joint and several liability. The Court of Appeals disagreed with this Court's reading of *Centra*, however, and remanded the case to this Court for a decision on the merits of Plaintiffs' Section 1392(c) claim.[2] The sole issue presently before this Court is whether a principal purpose of the Composition Agreement was to evade or avoid withdrawal liability within the meaning of Section 1392(c).[3]

## II. ANALYSIS

Under the MPPAA, an employer who withdraws from an ongoing multi-employer pension plan is liable for a proportionate share of the plan's unfunded vested liability. *See* 29 U.S.C. § 1381. The purpose of this "withdrawal liability" is to protect other contributing employers who would otherwise face increased funding obligations. 29 U.S.C. § 1001a(a)(4)(A).

---

[2] Although Plaintiffs did not allege a violation of Section 1392(c) in their pleadings, the Fourth Circuit found that the parties "tried this issue by consent." *Teamsters Joint Council No. 83 of the Va. Pension Fund v. Weidner Realty Assocs.*, 377 F. App'x 339, 343 n.3 (4th Cir. 2010).
[3] The parties declined this Court's invitation to file supplemental briefs or take further evidence on the issue. Instead, both parties rely on excerpts from briefs they filed in the Court of Appeals.

Toward that end, Section 1392(c) of the MPPAA provides that "[i]f a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction." 29 U.S.C. § 1392(c). The statute essentially prevents employers who face withdrawal liability from restructuring company assets to thwart the assessment and collection of that liability.

Plaintiffs contend that Section 1392(c) applies in this case because "[a] purpose of the 2008 Composition Agreement was to protect Sidney Levine over Empire Beef's unsecured creditors," and "[a]t the time, the Plaintiff Pension Fund was an unsecured creditor of Empire Beef."[4] (Pls.' Excerpts Ct. App. Brs. [hereinafter Pls.' Excerpts] 6.) In Plaintiffs' view, avoiding withdrawal liability was "one of the targets" of the asset restructuring, and thus it was "a principal purpose" of the transaction. (*Id.* at 6–7.) This Court finds their argument unpersuasive.

Although Plaintiffs are correct that Section § 1392(c) requires only that "*a* principal purpose" (as opposed to "*the* principal purpose") of the transaction be to evade or avoid withdrawal liability, Plaintiffs read the word "principal" out of the statute altogether. "The clear import of 'a principal' is to let the employer off the hook *even if one of his purposes was to beat withdrawal liability*, provided however that it was a minor, subordinate purpose." *Santa Fe Pac. Corp. v. Cent. States Se. & Sw. Areas*

---

[4] Steven Levine's brief testimony at trial concerning the Agreement confirmed the same. Specifically, he admitted on cross examination that the Composition Agreement was designed to protect his father from "all of the unsecured creditors," and that the Pension Fund was "one of those unsecured creditors." (J.A. 80.)

6

*Pension Fund*, 22 F.3d 725, 727 (7th Cir. 1994) (emphasis added), *cert. denied*, 513 U.S. 987, 115 S. Ct. 483 (1995). Section 1392(c) does not apply unless evading withdrawal liability was "one of the factors that *weighed heavily* in the [employer's] thinking." *Id.* (emphasis added).

In this case, evading withdrawal liability was merely a collateral purpose of the Composition Agreement.[5] Steven Levine testified on direct examination that several vendors were threatening lawsuits against Empire at the time of the Composition Agreement. He confirmed that the Composition Agreement was meant to protect Sidney Levine "with respect to those litigations, . . . [n]ot the Virginia Teamsters." (J.A. 80.) This Court credits Mr. Levine's testimony as forthright.

Moreover, the record evidence buttresses Mr. Levine's stated rationale. First, at the time of the Agreement, Empire owed approximately $12 million to GE. (J.A. 160.) Empire reasonably anticipated being sued on this debt at the conclusion of its bankruptcy proceedings, and indeed, GE promptly filed suit following Empire's dismissal from bankruptcy. Empire's debt to the Pension Fund ($485,936.18) pales in comparison. This bolsters Defendants' claim that the Agreement was intended to insulate Sidney Levine from Empire's creditors generally, not the Virginia Teamsters specifically.

Second, although the parties to the Agreement were father and son, the transaction was supported by adequate consideration. Empire owed Sidney Levine $1.3 million as a result of Sidney's $1.3 million loan to Empire in early 2007. The debt was secured by

---

[5] Arguably, eschewing withdrawal liability was merely an incidental *effect*—not an actively contemplated *purpose*—of the Agreement.

collateral which included all of Empire's real property, and "all partnership interests owned by Borrower, including but not limited to Weidner Realty Associates." (J.A. 248.) The Composition Agreement satisfied this debt by transferring to Sidney Levine Empire's partnership interest in Weidner and any ownership interest Empire had in the real property on which it operated its business. The fact that the transaction was supported by adequate consideration counsels against voiding the Agreement. *Cf. Connors v. Vick*, No. 5:91-0289, 1992 U.S. Dist. LEXIS 22850, at *12 (S.D.W. Va. Mar. 13, 1992) (considering lack of adequate consideration as a factor favoring application of Section 1392(c)).

Finally, the timing of the Composition Agreement does not render it suspect for the purpose of applying Section 1392(c).[6] Empire incurred withdrawal liability in late 2005. By the time Empire filed Bankruptcy in 2007, it had made twenty monthly payments of $7,464.00 each to the Fund—i.e., Empire had paid nearly $150,000 in less than two years toward satisfaction of its withdrawal liability obligations. The lengthy delay between the onset of withdrawal liability and the Composition Agreement bolsters Mr. Levine's testimony that that the primary purpose of the Agreement was to protect his father from Empire's other unsecured creditors. *Cf. Connors*, 1992 U.S. Dist. LEXIS 22850, at *12–13 (inferring purpose to evade withdrawal liability from fact conveyance was made within four to five weeks after service of summons in withdrawal liability action).

---

[6] The Court expresses no opinion generally on the propriety of transferring assets during bankruptcy with the intent to favor one creditor over others.

The facts of this case stand in marked contrast to those in which Courts have applied Section 1392(c) to void transactions. In each of those cases, the facts demonstrated a specific intent to avoid withdrawal liability.[7] *See, e.g., SUPERVALU, Inc. v. Bd. of Trs. of the Sw. Pa. and W. Md. Area Teamsters and Employers Pension Fund*, 500 F.3d 334, 341–42 (3d Cir. 2007) (applying Section 1392(c) where employer offered enhanced severance benefits in exchange for agreement which permitted employer to avoid withdrawal liability for the 2002–03 plan year); *Santa Fe Pac. Corp.*, 22 F.3d at 728–29 (voiding transaction where internal documents discussed how selling stock, versus selling assets, would permit company to avoid paying pension fund liability); *Sherwin Williams Co. v. N.Y. State Teamsters Conference Pension and Ret. Fund*, 158 F.3d 387, 389–90 (6th Cir. 1987) (applying Section 1392(c) where company executives explicitly discussed how to avoid $5–16 million in withdrawal liability by selling subsidiary); *Ret. Benefit Plan of Graphic Arts Int'l Union Local 20-B v. Standard Bindery Co.*, 654 F. Supp. 770, 771–72 (E.D. Mich. 1986) (disregarding transaction where, after being notified of withdrawal liability, defendants issued notes which re-characterized their capital advances as secured loans).

Here, however, the record merely indicates an awareness of withdrawal liability, which "is not equivalent to evasive intent." *Trs. of Teamsters Pension Fund of Phila. and*

---

[7] The circuits are split on whether the relevant intent is that of the seller alone, or whether courts must consider the intent of both the transferor and the transferee. *See Trs. of Teamsters Pension Fund of Phila. and Vicinity v. Fed. Express Corp.*, Nos 86-304; 94-017; 94-033; 94-112; 94-130, 1995 U.S. Dist. LEXIS 19980, at *17 n. 6 (D. Del. Dec. 27, 1995) (comparing approaches of the Third and Seventh Circuits). Because this Court does not find that Steven Levine (the transferor) intended to evade withdrawal liability, the Court need not decide whether transferee's intent must also be considered.

*Vicinity v. Fed. Express Corp.*, Nos 86-304; 94-017; 94-033; 94-112; 94-130, 1995 U.S. Dist. LEXIS 19980, at *18 (D. Del. Dec. 27, 1995); *see also UMWA 1992 Benefit Plan and Its Trs. v. Leckie Smokeless Coal Co.*, 201 B.R. 164, 174 (S.D.W. Va. 1996) (declining to void transaction because, unlike *Santa Fe*, record lacked facts indicating specific intent to avoid withdrawal liability). Thus, although the MPPAA "should be liberally construed in favor of protecting participants in employee benefit plans," *Centra*, 947 F.2d at 123, the facts of this case do not evince the kind of "intentional evasion of [withdrawal] liability" at which Section 1392(c) is directed, *SUPERVALU*, 500 F.3d at 341.[8]

Because this Court does not find that evading withdrawal liability was a principal purpose of the Agreement, Plaintiffs must honor the Composition Agreement when assessing and collecting withdrawal liability.

---

[8] It should be noted that the MPPAA requires arbitration for disputes arising under 29 U.S.C. §§ 1381–1399. *See* 29 U.S.C. § 1401(a). Consequently, courts are generally presented with a fairly detailed factual record and an arbitrator's decision. *See, e.g., Santa Fe*, 22 F.3d at 727 (noting that arbitrator heard evidence for 15 days and reviewed innumerable documents); *Sherwin Williams Co.*, 158 F.3d at 391–92 (noting that arbitration proceeding lasted four days and resulted in a 63-page decision). Courts afford the arbitrator's decision substantial deference on review. *See Sherwin Williams Co.*, 158 F.3d at 393 (reviewing arbitrator's decision for clear error). In this case, the Court lacks the benefit of an arbitrator's decision because of the unique procedural progression of the case. Plaintiffs first raised their Section 1392(c) claim in a motion *in limine* one week prior to trial. Under those circumstances, Defendants did not initiate arbitration proceedings in accordance with Section 1401(a). The Fourth Circuit has directed this Court to address the merits of Plaintiffs' Section 1392(c) claim notwithstanding the parties' failure to comply with Section 1401(a). Fortunately for this Court, the parties agree on the underlying facts, and simply disagree about whether those facts warrant the application Section 1392(c).

An appropriate Order will accompany this Memorandum Opinion.

/s/
Henry E. Hudson
United States District Judge

Date: Jan 20, 2011
Richmond, VA